# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NRO BOSTON, LLC and ALICE INDELICATO,<br><br>　　　　　Plaintiffs,<br><br>v.<br><br>KABBAGE, INC. and CELTIC BANK CORPORATION<br><br>　　　　　Defendants. | Civil Action No.:<br><br><br><br>**ORAL ARGUMENT REQUESTED** |

## PETITION TO VACATE AN ARBITRATION AWARD

Petitioners NRO Boston, LLC ("NRO") and Alice Indelicato (collectively "Petitioners"), by their attorneys, White and Williams LLP, respectfully petition this Court for an Order vacating an arbitration award pursuant to 9 U.S.C. § 10. In support, Petitioners simultaneous file a supporting memorandum of law, the Declaration of Shane R. Heskin, dated September 9, 2019, and the Declaration of James Williams, dated September 8, 2019. Petitioners further state as follows:

## NATURE OF THE UNDERLYING ACTION

1.   This is an action by a small Massachusetts business who was victimized by a "rent-a-bank" scheme used by Respondents Kabbage, Inc. ("Kabbage") and Celtic Bank Corporation ("Celtic") to violate Massachusetts' criminal usury laws.

2.   Kabbage is a large sophisticated business that specializes in issuing loans far in excess of Massachusetts' maximum legal rate of 20%.

3.   In order to charge small businesses interest rates in excess of 20%, Kabbage entered into a criminal enterprise with Celtic for the express purpose of evading the criminal usury laws.

4. A Member FDIC bank is not subject to state usury laws because of federal preemption.

5. A Member FDIC bank, however, is subject strict regulatory underwriting guidelines that make it difficult or impossible to provide same day approval of high-risk loans.

6. Although Kabbage is able to approve high risk loans within minutes because it is not subject to stringent federal banking regulations, it is subject to individual state usury laws.

7. A "rent-a-bank" scheme attempts to solve this problem in those states, like Massachusetts, that have criminally usury laws.

8. Under this "rent-a-bank" scheme, Celtic is identified as the lender on the loan documents.

9. Celtic's identification as the lender is essential to the scheme because, unlike Kabbage, Celtic is exempt from Massachusetts' usury laws by virtue of its charter in a state that has no maximum interest rate for commercial loans.

10. But Celtic is not the "true" lender.

11. Kabbage originates, underwrites and funds loans to Massachusetts' business at interest rates that violate Massachusetts' criminal usury laws.

12. Although the loan funds are purportedly issued by Celtic, the receivables to the loans are then immediately assigned to Kabbage, who then funds and services the loans. Kabbage also assumes full responsibility for all risk of loss.

13. Celtic's involvement in these loans is in name only and is paid a fixed percentage for the use of its name.

14. Kabbage cannot directly loan money at these rates to Massachusetts' businesses so it pays Celtic to use its charter to provide a cover for the illegal loan transactions.

15. Celtic is nothing more than a front for Kabbage's loan sharking business.

16. This rent-a-bank scheme has been the subject of numerous enforcement actions by Attorney Generals in different states, including Massachusetts.

17. Kabbage used this scheme to issue 30 loans at usurious interest rates to NRO over an approximately two-year period, each without notifying the Attorney General as required under Mass. Gen. Law c. 271, § 49.

18. Kabbage with the assistance of Celtic has systematically taken advantage of NRO for years, slowly devastating an otherwise profitable business that has employed dozens of Massachusetts residents for nearly a decade.

19. Kabbage's co-founder and COO, Kathryn Petralia, openly acknowledged that Kabbage is the "true" lender in transactions involving Celtic and also that Kabbage's loans are usurious in a joint webinar presented in partnership with the <u>National Federation of Independent Business</u>:

> Question 10:
>
> "What are the typical rates charged to applicants? We understand that it varies, but there is a range of cost."
>
> Answer:
>
> Our average effective APR, if you were to count it as a APR, would be in the low thirties, thirty percent. However, APR is often a misleading way of calculating the cost of borrowing, because it's really interesting, what you may not realize is if you have a twelve month loan that you pay off in two months, your cost, your APR, gets multiplied by six because the shorter term your loan, the higher your APR because of the way that APR is calculated.
>
> On average, our customers are paying just under five percent of the loan amount, if they hold the loan for thirty days, and they're paying just under thirteen percent of the loan amount if they hold the funds for six months. There are a lot of different ways that fees can be calculated across multiple providers, so it's really important that you understand all the various fees that could be assessed.

> Kabbage doesn't charge broker fees, or origination fees, or monthly maintenance fees. Many times, those fees are not actually calculated or included in the APR.
>
> Question 12:
>
> "Are you a direct lender?"
>
> Answer:
>
> The answer is yes. We are not a marketplace lender. We do securitize the receivables that are generated, the loans that are generated, meaning we have investors in those loans that we make, ***but Kabbage actually takes the risk of loss***. All of our loans are made in partnership with Celtic Bank, which is a Utah bank regulated by the FDIC. We work together with Celtic to manage customer relationships from the time they're originated all the way through the repayment of the loan.

https://www.kabbage.com/blog/ins-outs-online-lending-kabbage-co-founder-kathryn-petralia-webinar-transcript/ (emphasis added).

20.     In reality, Kabbage is the commercial equivalent of a "payday lender."

21.     It preys on the weak and desperate and extorts unconscionable terms that are expressly prohibited by the criminal laws, civil statutes, and the strong public policy of this Commonwealth.

22.     Among other unconscionable business practices, Kabbage has knowingly and intentionally violated Mass. Gen. Law c. 271, § 49 by charging outrageous interest rates on loans that are several times the 20% maximum interest rate permitted under the criminal laws of this Commonwealth.

23.     A violation of this Commonwealth's criminal usury law is not a minor infraction; it is a felony punishable up to ten years in state prison. It is also a felony to even possess the instrument.

24.     As the Attorney General of this Commonwealth has advised, the crime of usury is

> offensive, detrimental and injurious to the life, health and general welfare of the borrowers and their families," in that it diverts a large percent of the borrowers' incomes from "otherwise beneficial directions," and materially reduces their ability to obtain the social and economic benefits which their incomes would normally secure to them. Said activities breed strife and unrest *and cause the borrower in his extremity to go to others engaged in the same unlawful activities*, further depriving himself and his family of the necessities of life and resulting in emotional and mental distress affecting the borrower's performance as an employee and *adding to the relief rolls*. Said business is obnoxious and detrimental to retailers of goods who serve the borrowers and their families because the excessive interest reduces the sum available to pay for supplies furnished. *Because of these effects on many hundreds of persons the Counterclaim Defendants' activities are contrary to the good morals, public peace and general welfare of the people and contrary to the public policy of the Commonwealth*. The majority of the borrowers are humble citizens, ignorant of the law, and their legal rights against the Counterclaim Defendants are inadequate and ineffective. They have no means to defend themselves. There is thus presented, the bill alleges, "an intolerable situation" that cannot be remedied, except by relief in equity.

*Commonwealth v. Stratton Finance Co.*, 38 N.E.2d 640, 641-42 (Mass. 1941) (emphasis added).

25. Every one of these concerns has materialized in this case.

## THE PARTIES

26. Petitioner NRO Boston, LLC is a Massachusetts corporation with its principal place of business located at 124-26 Charles Street, Boston, Massachusetts 02114.

27. Petitioner Alice Indelicato is an individual who resides at 3 Oakdale Boston, MA 02539.

28. Respondent Kabbage is a limited liability company duly organized and existing under the laws of the State of Georgia, with its principal place of business located at 925B Peachtree Street NE, Suite 1688, Atlanta, GA 30309.

29. Respondent Celtic Bank is an industrial bank chartered by the State of Utah and existing under the laws of the State of Utah, with its principal place of business located at 268 South State Street, Suite 300, Salt Lake City, Utah 84111.

## JURISDICTION AND VENUE

30. Respondents Kabbage and Celtic are subject to the personal jurisdiction of this Court under the Massachusetts Long-Arm Statute, G.L.c. 223A, § 3, because each of the transactions at issue arose from the Defendants' purposeful transaction of business within Massachusetts. Respondents Kabbage and Celtic are further subject to the personal jurisdiction of this Commonwealth because each directed their tortious conduct within this Commonwealth.

31. This Court also has original jurisdiction over this action based upon 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between Plaintiffs and Defendants, and the amount in controversy exceeds, exclusive of interest and costs, the sum of $75,000.

32. Venue is proper under 9 U.S.C. § 10(a) because the arbitration award was made within this district.

## FACTUAL BACKGROUND

33. NRO is a clothing and sports retailer with locations in Beacon Hill, Martha's Vineyard, Nantucket and Wellesley.

34. It is owned by Alice and Jason Indelicato, who are husband and wife, and have lived in Massachusetts their whole life.

35. Beginning in January 2014, Kabbage began using a common instrument known as a "factoring agreement" in an effort to avoid Massachusetts' criminal laws.

36. Kabbage entered into five such agreements between January 4, 2014 and April 11, 2014 (the "Kabbage Merchant Cash Agreements").

37. While these Merchant Cash Agreements contain form language stating that they are not loans, that is exactly what they are.

38. Factoring, otherwise known as "accounts receivable financing," is a form of financing whereby a business sells its receivables to a third-party financial company known as a "factor" at a discount to obtain cash.

39. The sale of the receivables transfers ownership of the receivables to the factor, meaning that the factor owns all the rights and risks associated with owning the receivables, including the risk of nonpayment.

40. A true factoring agreement is sale (not a loan), and thus, would not be subject to state usury laws.

41. Over the years, factoring companies regularly changed their forms in response to adverse court decisions to try to make them look like "true" factoring agreements, although most remain disguised loans.

42. Unlike the more sophisticated factoring agreements now being used by companies, like Kabbage, in their attempt to avoid the criminal usury laws, the Kabbage Merchant Cash Agreements hide nothing.

43. Under the agreements, Kabbage advances money to NRO, who in turn, is obligated to repay that money plus additional cost or interest over a six-month term.

44. The required payments are referred to as "Minimum Monthly Transfers."

45. Pursuant to Section 1.5 of the Kabbage Merchant Cash Agreements, a default includes NRO's failure "to make any transfer under this Agreement."

46. A default further includes NRO's failure "to comply with or to perform any term, obligation, covenant, or condition under this Agreement" and NRO is obligation under Section

1.2 (x) "[t]o transfer <u>Proceeds</u> to us (in U.S. dollars) by the applicable Transfer Date" (emphasis in the original).

47. Thus, while the Kabbage Merchant Cash Agreements purport to purchase NRO's future receivables and purport not to be loans, NRO bears all the risk of nonpayment, including the risk that there will be insufficient receivables to make the transfers.

48. In the event of any one of these defaults, Kabbage is then permitted to immediately seize the business assets secured under the Security Agreement as well as the personal assets of Indelicato under the Personal Guarantee.

49. Where the factor bears no risk of nonpayment, the transactions are nothing more than disguised loans.

50. The form used in each of the five transactions was the same with the only difference being the amount advanced and the repayment terms.

51. The interest rate for each of the Kabbage Merchant Cash Agreements is far in excess Massachusetts' criminal usury rate of 20%.

52. In April 2014, Kabbage did away with using merchant cash advances as the front for its illegal loan sharking business in favor of new, albeit equally illegal scheme.

53. On April 14, 2014, Kabbage sent the following e-mail to NRO:

> **Dear Alice,**
>
> Kabbage is excited to announce our new loan product! It is still the working capital line you depend on, but our new partnership with Celtic Bank now gives you access to a business line of credit.
>
> Quick facts about Kabbage loans:
>
> - Kabbage will be converting all existing merchant advances and working capital lines to loans and lines of credit.
> - You'll get the **same great terms** with the same personal service.

- **Your payment schedule and rates will NOT change.**
- **Kabbage is the same company** with the same focus on great service.
- Once your MCA has been converted you must read and agree to the new 'Kabbage Business Loan Agreement'.

These changes give us more flexibility, so look for new products, including longer payment terms, in the future!

54. Kabbage's simple transformation of sold assets into a loan with no change in the terms or the rate shows that the Merchant Cash Agreements were loans in the first place.

### Kabbage "Rents" a Utah Bank to Violate State Usury Laws

55. The new scheme began on March 20, 2014 when Kabbage entered into a "Program Management Agreement" ("PMA") with Celtic Bank.

56. Pursuant to the PMA, Celtic Bank agreed to originate and fund business loans through the marketing efforts of Kabbage.

57. In practice, Celtic Bank did not retain any interest in the Kabbage loans.

58. The PMA is "rent-a-bank" scheme and is designed for one purpose; to allow third-party lenders like Kabbage to circumvent state usury laws.

59. Because Celtic Bank is subject to the control, regulation and/or examination of the State of Utah, it is not subject to Massachusetts' criminal usury statute, but rather, is subject to Utah's usury laws.

60. Utah has no maximum usury rate for commercial loans so it can legally originate and fund commercial loans to Massachusetts' businesses in excess of 20% without violating Massachusetts' criminal usury laws.

61. Kabbage has no such protection and would be subject to Massachusetts criminal usury laws for any loans it originated and funded to Massachusetts' businesses.

62. Thus, in order to circumvent Mass. Gen. Law c. 271, § 49, Kabbage conspired with Celtic to enter into an arrangement whereby Celtic is nothing more than a front for Kabbage's loan sharking business, the purpose and effect of which is to evade criminal and civil liability in Massachusetts for knowingly issuing loans to Massachusetts' businesses in excess of 20%.

63. In fact, the Commonwealth of Massachusetts, by and through its Attorney General, brought an action to shut down a similar scheme where a lender located on tribal land and subject to tribal law (Western Sky) entered into an agreement to sell its loans to CashCall.

64. On October 6, 2015, the Massachusetts' Attorney General filed a complaint in Suffolk Superior Court alleging that Western Sky and CashCall were victimizing Massachusetts consumers by unfairly and deceptively charging interest in excess of Massachusetts' usury laws.

65. In response, Western Sky and CashCall asserted that they were not subject to the regulators' jurisdiction because the loans were provided through Western Sky, which was located on the Cheyenne River Indian Reservation in South Dakota, and therefore had tribal immunity from state and federal banking laws. The defendants argued that the rates charged were permissible under tribal law.

66. Their argument was rejected by the trial court. After losing their jurisdictional arguments, the defendants settled the lawsuit with the Massachusetts Attorney General.

67. The settlement included a permanent injunction where the lenders agreed to no longer do business in the Commonwealth and provide $17 million in refunds and loan modifications for their victims.

68. Following the settlement, the Undersecretary of the Office of Consumer Affairs and Business Regulation, John C. Chapman, commented that: "[a]ny businesses attempting to

avoid the licensing and usury laws of the Commonwealth at the expense of Massachusetts consumers will not be tolerated. This settlement is a victory for the thousands of Massachusetts consumers who took out Western Sky loans and serves as a warning to unlicensed lenders."

69. The State of New York has also cracked down on this "rent-a-bank scheme" in obtaining similar results against Western Sky Financial, LLC, Cash Call, Inc. WS Funding, LLC and their owners. *See* http://www.ag.ny.gov/press-release/ag-schneiderman-announces-settlement-western-sky-financial-and-cashcall-illegal-loans.

70. So has the District of Columbia. *See* http://oag.dc.gov/release/cashcall-agrees-provide-nearly-3-million-refunds-and-debt-forgiveness-district-consumers.

## Kabbage Victimizes NRO using the Rent-a-Bank Scheme

71. Beginning on May 6, 2014, Kabbage entered into the first of 30 loans with Kabbage. *See, e.g.,* Exs 1, 25.

72. Kabbage is a direct lender.

73. Kabbage is not a marketplace lender.

74. The loan agreements executed by NRO were all referred to as a "Kabbage Commercial Loan Agreement".

75. Kabbage (not Celtic Bank) took the risk of loss on the loans.

76. NRO at all times dealt exclusively with Kabbage.

77. All of NRO's communications were with Kabbage. NRO had absolutely no dealings of any kind with Celtic on any of these 30 loan transactions.

78. In fact, all of the loans were funded directly by Kabbage out of Kabbage's own bank account. *See id.*, Exs. 802-03.

79. Celtic was the lender in name only.

80. The "true" lender in all 30 loan transactions was Kabbage, which bore 100% of the risk of loss.

81. All of the loans where Celtic is identified as the lender were immediately purchased by, and assigned to, Kabbage.

82. Contrary to the PMA, Kabbage originated and funded all 30 loans.

83. The interest rate for each of the 30 loans was far in excess of Massachusetts' maximum legal rate of 20%.

84. The terms of the loans were contained in the standard "Kabbage Business Loan Agreement."

85. The loan agreements were all titled "Kabbage Business Loan Agreement," yet the lender was identified as Celtic.

86. All of the loans were done electronically and contained the following form language at the end of the agreements:

> If you need more information, describe the item you are unsure about. **You remain obligated to make any remaining Total Minimum Monthly Payment while we investigate.**
>
> Consent to Electronic Disclosure. You can access transaction information by visiting www.kabbage.com and logging in. By checking the "Submit" box on your application, you agree to receive this Agreement and subsequent disclosures and notices (collectively, "Subsequent Disclosures") electronically. We will provide electronic copies of periodic statements and Subsequent Disclosures on our web site. To access, view and retain electronic disclosures on our web site, you must have a computer with Internet access and either a printer connected to your computer to print disclosures/notices or sufficient hard drive space available to save the information. The minimum software requirements include browser software that supports 128-bit security encryption and Adobe Reader® version 9.0. By clicking the "Submit" button on your application, you acknowledge that you are able to access our website (www.kabbage.com) and print, or otherwise retain, electronic disclosures. You may request a paper copy of any legally required disclosure by contacting us at Kabbage Business Loan—Paper Disclosure Request, P.O. Box 77081, Atlanta, GA 30357. You may also withdraw your consent to electronic disclosures by contacting us in the same manner. If you withdraw your consent to electronic disclosures, we may elect to terminate our relationship with you. You agree to provide us with your current e-mail address for notices. If your e-mail address changes, you must send us a notice of the new address by writing to us at least five days before the effective date of the change.
>
> **By checking the "Submit" box in your application, you acknowledge receipt of this Agreement, state that you have read and agreed to its terms and conditions, and agree to receive disclosures electronically.**
>
> *Electronic Signature of Merchant/Owner*: You each acknowledge and agree that any electronic or digital signature provided by telephone, on any application or other document signed in connection with your account represents your signature on this Agreement.

87. Kabbage is subject to Massachusetts' criminal usury laws and never notified the Attorney General's Office of its intent to make loans greater than $6,000 with otherwise usurious interest rates pursuant to G.L. c. 271, §49.

88. After paying Kabbage hundreds of thousands of dollars in principal and interest, NRO could no longer keep up with the usurious loan payments, at which time Kabbage began threatening NRO's owners to collect upon an unlawful debt.

### **The Loans are a Per Se Violation of 93A**

89. Kabbage issued NRO loans with interest rates in excess of 20%.

90. In an attempt to evade the criminal laws of this Commonwealth, Kabbage included a choice-of-law provision that purports to apply another state's law.

91. Each of these agreements, however, was applied for, executed and transacted in Massachusetts.

92. Each of the transactions involves a Massachusetts business and Massachusetts residents.

93. Each of the transactions was fully funded in Massachusetts and repaid from revenues earned in and paid from Massachusetts.

94. Each of the transactions was electronically debited from NRO's Massachusetts bank accounts.

95. In addition to these central Massachusetts contacts, the criminal activity and financial harm was directed and felt wholly within Massachusetts.

96. Furthermore, each of these loan transactions violated the strong public policy of this Commonwealth.

97. Among other things, each of the transactions violated Mass. Gen. L. ch. 271, § 49. The title of the statute is Criminal Usury, which is a felony punishable up to ten years in state prison. Moreover, this criminal statute is contained within Chapter 271 of Massachusetts General Laws, titled "Crimes Against Public Policy."

98. As a matter of law, the choice-of-law provision is unenforceable because Kabbage cannot contract around the criminal laws of this Commonwealth. *See Cashcall, Inc. v. Mass. Div. of Banks,* 3 Mass. L. Rep. 5 (Mass. Super. Ct. 2015) (holding that Massachusetts criminal usury laws applied to out-of-state resident despite choice-of-law provision because "[a]ll of the loans were applied for, paid from, and collected from Massachusetts.").

## DAMAGES

99. As a direct and proximate cause of the financial strain resulting from this series of transactions with Kabbage, NRO was forced to enter into a series of criminally usurious loans with other high interest lenders in order to keep up with the oppressive monthly payments of the Kabbage loans.

100. As a direct and proximate result of each of these loans, NRO's business assets have been frozen, its employees and owners have been harassed, and NRO has had to defend numerous lawsuits as a result of certain these attempts to collect upon an unlawful debt.

101. As a direct and proximate result of each of these loans, NRO suffered indivisible injury through loss of goodwill, lost profits, and devaluation of its business.

102. As a direct and proximate result of each of these loans, NRO suffered indivisible injury by having its other business loans being called in from legitimate banks, deterioration of its credit profile, and the inability to secure financing to obtain needed inventory and pay its vendors.

103. As a direct and proximate result of each of these loans, Alice Indelicato has suffered indivisible injury through severe mental anguish and emotional distress. In addition to being harassed by these unlawful actions, Alice Indelicato has had liens placed on her residential home and has her personal assets frozen.

104. As a direct and proximate result of each of these loans, Alice Indelicato has also suffered an indivisible injury by having to drain all of her personal assets by providing personal and family loans to NRO in order to keep her family's only means of livelihood afloat.

## PROCEDURAL BACKGROUND

105. On October 12, 2017, Petitioners filed an action in this Court seeking, among other things, a declaration that the Kabbage loans were void under Mass. Gen. Law. c. 271, §49.

106. In response, Respondents filed a motion to compel arbitration.

107. In support of the motion, Kabbage represented that it was the assignee of Celtic and therefore was entitled to enforce the arbitration provision contained within the Kabbage loan agreements.

108. Relying upon these representations, Petitioners agreed to have the threshold issue of arbitrability decided through arbitration, and the original action was closed.

109. The representation by Kabbage turned out to be false.

110. Rather, at the time of these representations, Kabbage had assigned all of its rights to TBF Financial, Inc., a third-party debt collector.

## THE ARBITRATION

111. The first issue decided by the arbitrator was arbitrability.

112. Petitioners opposed arbitration on numerous grounds, including unconsionability, duress and failure to fairly disclose the arbitration provision.

113. The arbitrator rejected each of these arguments. *See* Ex. 817, Order of JAMS Arbitrator, Sept. 7, 2018.

114. After a six-day hearing, the arbitrator denied all of Petitioners' claims, and found in favor of Celtic on a counterclaim that it never even asserted, and awarded Celtic $109,394.49 in damages, $2,728,514 in legal fees, and $447,208 in expenses. The total award is $3,285,116.49.

115. The Final Award was issued on July 24, 2019. *See* Ex. 818.

116. Notably, however, the arbitrator held that Kabbage was not a party to the Kabbage loan agreements, and therefore, had no right to enforce the terms of the attorney's fee provision.

117. Despite finding that Kabbage was not a party to the Kabbage loan agreements, the arbitrator nonetheless decided the merits of Petitioners' claims against Kabbage without having any authority to do so.

118. Under the express terms of the Kabbage loan agreements, the arbitrator's authority is limited to the Parties.

119. Thus, once the arbitrator found that Kabbage was not a party to the Kabbage loan agreements, he had no power to decide the claims by or against Kabbage.

## GROUNDS TO VACATE THE AWARD

120. A court may vacate an arbitration award where: (1) the award was procured by corruption, fraud, or undue means; (2) there was evident partiality or corruption in the arbitrators, or either of them; (3) the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any misbehavior by which the rights of any party have been prejudiced;

or (4) the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.  *See* 9 U.S.C. § 10(a).

121.   This Petition is timely because it has been filed within ninety days after the Arbitration Award was issued and delivered.

122.   No motion to confirm the Award has been made or granted.

123.   No prior application has been made to any court for the relief requested.

124.   Thus, pursuant to 9 U.S.C. § 10, the Award should be vacated due to:  (1) a manifest disregard of the law; (2) exceedance of the arbitrator's authority; and (3) evident partiality.

### Manifest Disregard of the Law

125.   In order to vacate an award due to a manifest disregard of the law, Petitioners must demonstrate that the arbitrator recognized the law and then ignored it.

126.   The first prong is easily met:  "I am also required to employ the 'predominant economic interest test.'"[1]

127.   The second prong is likewise met.  Despite recognizing that he was *required to apply* the "predominant economic interest" test to determine the "true lender," the arbitrator nonetheless held that Celtic was the "true lender" merely because it had "significant" risk.

128.   But that is not the test.

129.   As recognized by his own decision, the test is which party has the "*predominant*" economic interest.

130.   No rational tribunal could find that Celtic had the "predominant" economic interest when 100% of the receivables was sold to Kabbage—*within two days*.

---

[1] *Id.,* Final Award, at pg. 11.

131. Indeed, that conclusion is so irrational that the arbitrator could not even put "Celtic" and "predominant" in the same sentence in any of his findings of fact or law.

132. But it gets worse. Respondents *did not even contend* that Celtic had the "predominant" economic interest, perhaps because 100% is obviously greater than 0%.

133. Instead, Respondents argued that the arbitrator should *not apply* the "predominant economic interest" test because, they claimed, application of the test would create chaos in the banking industry and result in reduced lending.

134. In fact, not one witness was willing to get on the stand to testify under oath that Celtic had the "*predominant*" economic interest in any of the loans—not even their paid expert witness on banking.

135. But even more astonishing, it was undisputed that Celtic assigned away the rights to the receivables just two days after the loans were issued, and therefore, Celtic had no possible right to collect upon the $109,394.49 allegedly owed under the Kabbage loan agreements.

136. No rational tribunal could have misunderstood this basic concept.

137. The arbitrator's award to Celtic based on a claim that it did not even assert and receivables it undisputedly sold is so beyond irrational that it only underscores the fundamental unfairness of the proceeding and depravation of due process.

### Exceedance of Authority

138. The Court must also vacate the arbitration award because the arbitrator exceeded the scope of his authority pursuant to his own finding that Kabbage was not a party to the Kabbage loan agreements.

139. Under the plain language of the relevant arbitration provisions, the arbitrator's authority was limited to "the Parties" to the contract.

140. The arbitrator therefore exceeded his authority by resolving the claims against Kabbage under agreements to which the arbitrator expressly held Kabbage was not a party.

### **Evident Partiality**

141. The arbitration award must be vacated on the basis of evident partiality.

142. Most telling of this bias is the arbitrator's misleading disclosure concerning an interested third party James Williams.

143. Mr. Williams was a personal friend of Petitioners and had lent them over half-a-million dollars.

144. During the hearing, the arbitrator actually suggested that Petitioners file for bankruptcy and pay back their friends and family on the side.

145. As it turns out, Mr. Williams was also a close personal friend of the arbitrator. Contrary to the arbitrator's disclosure that he only saw Mr. Williams in passing and that they did not go to each other's homes, Petitioners have since learned that (1) Mr. Williams went to the arbitrator's home at least *forty times*; (2) Mr. Williams and the arbitrator have been members of the same Yacht Club for *fifty-five years*; and (3) the arbitrator actually—*attended his wedding*.

146. This undisclosed evident partiality helps explain the manifest disregard of the law that has fatally infected the Award.

147. When all of these factors are considered in the aggregate, it is obvious that the arbitral forum deprived Petitioners of their fundamental right to due process of law.

WHEREFORE, Petitioners seek an order from this Court:

a) Vacating the Award; and

b) Granting such other and further relief as this Court deems just and proper.

Dated:  September 9, 2019

**WHITE AND WILLIAMS LLP**

_____

**WHITE AND WILLIAMS LLP**
Shane R. Heskin (BBO No. 665098)
Justin E. Proper (BBO No. 645753)
101 Arch Street, Suite 1930
Boston, MA 02110
(617) 748-5200 or (215) 864-6329
heskins@whiteandwilliams.com
properj@whiteandwilliams.com

23398496v.1